# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| ERSTE-SPARINVEST KAPITALANLAGEGESELLSCHAFT m.b.H., Derivatively on Behalf of TELIK, INC., ) ) ) ) | |
| Plaintiff, ) ) | 07 CIV 7881 |
| v. ) ) | Civil Action No. |
| MICHAEL M. WICK, CYNTHIA M. BUTITTA, MARC L. STEUER, EDWARD W. CANTRALL, ROBERT W. FRICK, STEVEN R. GOLDRING, MARY ANN GRAY, RICHARD B. NEWMAN, STEFAN RYSER, REINALDO F. GOMEZ, GAIL L. BROWN, and HERWIG VON MORZE, ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Defendants, ) ) ) | |
| and ) ) | |
| TELIK, INC. ) ) ) | |
| Nominal Defendant. ) ) | |

RECEIVED
SEP 07 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Judge Pauley

## INTRODUCTION

1.      This is a shareholder's derivative action brought on behalf of nominal defendant Telik, Inc. ("Telik" or the "Company"), by shareholder plaintiff Erste-Sparinvest Kapitalanlagegesellschaft m.b.H. ("Erste-Sparinvest") against the Company's board of directors ("Individual Defendants") for: (i) breach of fiduciary duty by making false pubic statements about its lead drug product candidate TELCYTA (and/or "TLK286") while failing to disclose that (a) TELCYTA clinical trials were not being conducted under U.S. Food and Drug Administration ("FDA") clinical trial standards, thus generating useless data, (b) subjects in TELCYTA clinical trials were *dying sooner* than those not using TELCYTA, and (c) Defendants knew TELCYTA would not receive FDA approval and was not a commercially viable drug; (ii) issuing false public statements to cause Telik's shares to trade at artificially inflated levels, and (iii) consciously or recklessly failing to monitor, prevent or remedy the underlying misconduct alleged herein, including by failing timely to report TELCYTA's safety dangers to the FDA.

2.      Telik is a biopharmaceutical company that purports to engage in the discovery, development, and commercialization of small molecule drugs to treat cancer. During the relevant period from March 27, 2003, through June 4, 2007 (the "Relevant Period"), the Company consistently made untrue statements of material facts to generate great expectations for commercial success of its new drug TELCYTA, a small molecule cancer drug product designed to be activated in cancer cells. TELCYTA was the core product of Telik on which the Company leaned heavily for future growth and profitability.

3.      During the Relevant Period, the Company conducted multiple clinical trials to evaluate the effectiveness of TELCYTA, and proclaimed positive results to investors. Defendants declared that those clinical trials were on track to obtain FDA approval for the use of

TELCYTA in the treatment of platinum-resistant or refractory ovarian cancer and, later, small-cell lung cancer. Because those clinical trials supposedly focused on the survival of a pre-designated percentage of study participants, and because defendants stated those trials were "state-of-the-art," defendants claimed they would be able to strictly monitor the progress of the trials and report to the investing public any material changes in the timing of the studies, the number of participants, or any other material factors affecting the studies to the investment community.

4.      Meanwhile, defendants deceived analysts, the investing public and even the FDA throughout the Relevant Period into believing that their heavily promoted cancer treatment drug, TELCYTA, was safe and effective for public use, and that the Company had conducted and was continuing to conduct state-of-the-art clinical trials to prove it. Yet defendants concealed from the investing public and the FDA that subjects in the TELCYTA trials were dying at alarming rates – several months sooner than similarly situated patients not taking TELCYTA – and doctors were pulling other subjects out of the TELCYTA trials early, compromising the data being gathered.

5.      Defendants proclaimed throughout the Relevant Period that the Company's TELCYTA clinical trials were subject to the FDA's rigorous "adequate and well-controlled" clinical trial standards. Yet the truth was that TELCYTA clinical trials, conducted under the watch of the Company's Chief Medical Officer defendant Gail L. Brown, M.D. ("Brown") – the *wife* of defendant CEO Michael Wick – were anything but "adequate and well-controlled." Instead, they were poorly designed, poorly administered, and generated seriously flawed clinical data – garbage in, garbage out – that defendants knew would be unacceptable to the FDA. Defendants declared that the ongoing TELCYTA clinical trials were "robust and

3

sophisticated" and "designed to support a successful New Drug Application ("NDA") filing with the FDA for our lead drug candidate, TELCYTA", and claimed the Company was "monitor[ing] patient enrollment levels." Inexplicably, defendants never disclosed that in at least two of the final TELCYTA clinical trials, *up to 25% of the subjects were prematurely released from the study*. Defendants would later admit that the data being obtained in another of the final TELCYTA clinical trials was riddled with inconsistencies rendering it suspect as well. However, defendants concealed from the investing public and the FDA until June 4, 2007, the full extent of their knowledge of the drug's deadly toxicity and the disastrous TELCYTA clinical trial results.

6.     On December 26, 2006, the truth began to emerge when Company shocked the market by reporting preliminary data revealing that TELCYTA had failed all three of its clinical trials. Regarding one trial, the Company admitted that "TELCYTA did not achieve a statistically significant improvement in overall survival, the primary endpoint." Regarding another trial, the Company admitted that TELCYTA "did not achieve its primary endpoint of demonstrating a statistically significant improvement in overall survival for TELCYTA as compared to the active controls." Additionally, the Company disclosed that in a third clinical trial, approximately 25 percent of the patients were prematurely discontinued from the assigned study treatment.

7.     As a direct result of the market learning on December 26, 2006, that TELCYTA had failed all three of its clinical trials – showing no efficacy in two of the three trials and impermissibly flawed clinical data in another two of the three trials – the Company's stock plunged 70% in a single trading session – falling from over $16 per share to at $4.77 per share

on December 26, 2006, on more than 33 times the previous 30 days' average daily trading volume and erasing more than $600 million in market value.

8.    Next, on June 3, 2007, the Company released the results of its ASSIST-1 trial at the annual meeting of the American Society of Clinical Oncology (ASCO).  In stark contrast to the Company's prior statements promoting great expectations for commercial success of TELCYTA, the Company revealed for the first time that participants in the study groups actually died sooner when they used TELCYTA, at an average of five months sooner than those who did not receive the drug.  The following day, the FDA placed a clinical hold on the Company's Investigational New Drug Application for TELCYTA, which was initiated by the FDA following the presentation of TELCYTA Phase 3 clinical trial results.  The effect of this clinical hold stopped new patient enrollment in TELCYTA clinical trials, and the Company was prohibited from administering additional doses of the drug to those patients already enrolled in the trials.

9.    Following the Company's June 3, 2007 admissions and the FDA's June 4, 2007 announcement ordering Telik to immediately halt all TELCYTA clinical trials because of the alarming number of fatalities related thereto, shares of the Company's stock declined an additional 41 percent, to close on June 5, 2007, at $3.42 per share, on unusually heavy trading volume.

10.    The true facts, undisclosed during the Relevant Period, were as follows:

(a)    The final-stage clinical trials of TELCYTA were not being conducted pursuant to the FDA's rigorous "adequate and well-controlled" clinical trial standards, rendering the data generated useless;

5

(b)    Subjects in the TELCYTA clinical trials were dying sooner than those not using TELCYTA;

(c)    Based on the dire TELCYTA clinical trial results that defendants knew but concealed throughout the Relevant Period, defendants knew that the Company's TELCYTA NDA would be rejected by the FDA; and

(d)    Based on the dire TELCYTA clinical trial results that defendants knew but concealed throughout the Relevant Period, defendants had no reason to believe the Company's TELCYTA New Drug Application would be accepted, and thus the defendants knew that TELCYTA would not be a commercially viable drug candidate.

11.    As a result of defendants' materially misleading Relevant Period statements and omissions, Telik's stock traded at inflated levels during the Relevant Period, trading as high as $29.04 per share by April, 2004, whereby the Company sold over $322 million worth of Telik stock in two underwritten public stock offerings. The Registration Statements and Prospectuses issued in connection with the 2003 and 2005 Offerings were also materially misleading as they misstated the known safety and integrity flaws in the TELCYTA clinical trials.

12.    As a result of defendants' wrongful conduct, Telik has been materially damaged. Certain Individual Defendants and corporate insiders have misappropriated and misused material non-public proprietary corporate information, including by concealing that: (i) TELCYTA clinical trials were not being conducted according to FDA clinical trial standards, thus generating useless data, (ii) subjects in TELCYTA clinical trials were dying sooner than those not using TELCYTA, and (iii) based on the dire TELCYTA clinical trial results, Individual Defendants knew TELCYTA would not receive FDA approval and was not a commercially viable drug.

13.     Not only has the foregoing damaged the Company's reputation and good will, it has resulted in the Company being named as a defendant in securities fraud litigation now pending in the Southern District of New York and the Northern District of California. Moreover, Telik will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled securities analysts and the investing public, such that Telik' ability to raise equity capital on favorable terms in the future will be impaired.

14.     The Individual Defendants are antagonistic to this lawsuit and making a demand on the Board of Directors would be futile. The majority of the Board participated in and or consciously abdicated their fiduciary duties in connection with allowing the misconduct alleged herein to occur during the Relevant Period.  The members of the Board, as a whole, have extremely close alliances with and allegiances to the insiders who are engaged in the illegal and improper conduct complained of herein and to one another, and thus would not be willing to bring any action directly against them on behalf of the Company.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff is a citizen of a foreign state and defendants are citizens of the United States and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

16.     This action is not a collusive one designed to confer jurisdiction on a United States District Court that it would not otherwise have.

17.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' participation in the wrongful acts detailed herein, occurred in this district. Further, defendants have received

substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district, including the following:

        (a)      during the Relevant Period Telik conducted the overwhelming majority of its analyst conferences relating to TELCYTA almost exclusively in this District, including the UBS Global Life Sciences Conference in New York City on September 26, 2006; the Bear Stearns 19th Annual Healthcare Conference in New York City on September 12, 2006; the Needham & Company, LLC Fifth Annual Biotechnology and Medical Technology Conference in New York City on June 14, 2006; the Merrill Lynch Global Pharmaceutical, Biotechnology and Medical Device Conference in New York City on February 7, 2006; the Lazard Capital Markets Life Sciences Conference in New York City on November 30, 2005; the Bear Stearns 18th Annual Healthcare Conference in New York City on September 13, 2005; the UBS Global Life Sciences Conference in New York City on September 27, 2005; the UBS Global Pharmaceuticals Conference in New York City on May 24, 2005; the Fourth Annual Needham Biotechnology Conference in New York City on May 25, 25, 2005; the Merrill Lynch Global Pharmaceutical, Biotechnology and Medical Device Conference in New York City on February 10, 2005; the Lazard First Annual Life Sciences Conference in New York City on November 30, 2004; the UBS Global Life Sciences Conference in New York City on September 28, 2004; the Newsmakers in the Biotech Industry Conference in New York City on September 9, 2004; the Thomas Weisel Healthcare Tailwinds 2004 Conference in New York City on September 8, 2004; the Third Annual Needham Biotechnology Conference in New York City on June 17, 2004; Wick's corporate update at the BIO CEO and Investor Conference in New York City on February 25, 2004; Wick's presentation at an Industry Focus Session on reproductive and genito-urinary cancers in New York City on February 24, 2004; the Merrill Lynch Global

Pharmaceutical, Biotechnology and Medical Device Conference in New York City on February 4, 2004; the Piper Jaffray Health Care Conference in New York City on January 29, 2004; the UBS Global Life Sciences Conference in New York City on September 24, 2003; and the Second Annual Needham & Company Biotechnology Conference in New York City on June 4, 2003.

        (b)    Many of the clinical studies of TELCYTA were conducted in or about this District, including:

- The Phase 2 Study of TLK286 (TELCYTA) in Platinum Resistant Advanced Epithelial Ovarian Cancer conducted at the Memorial Sloan-Kettering Cancer Center in New York City.

- The TLK286 (TELCYTA) vs. Doxil/Caelyx or Hycamtin in Platinum Refractory or Resistant Ovarian Cancer conducted at The Mary Imogene Bassett Hospital in NY; NYU School of Medicine in NYC; The Union State Bank Cancer Center at Nyack Hospital in NY; Med-Onc/Hem, Malone in NY; Gynecologic-Oncology in NY; Memorial Sloan Kettering Cancer Center in NYC; Good Samaritan Hospital Medical Center in NY; Benjamin Schwartz, M.D. in NY; South Bay OB/GYN in NY; Hematology-Oncology Associates of Rockland in NYC; Comprehensive Cancer Center Medical Practice Offices in NYC; Bellevue Hospital Center in NYC, North Shore-Long Island Jewish Health System/Medical Center in NY; New York University Medical Center – Tisch Hospital in NYC; Long Island Jewish Medical Center in NY; The Cancer Institute of New Jersey in NJ; Jersey Shore University Medical Center in NJ; Robert Wood Johnson University Hospital in NJ; St. Elizabeth's Med. Ctr. In Boston; Whittingham Cancer Center at Norwalk Hospital in Connecticut; and Hematology Oncology, P.C. in Connecticut.

- Study of TLK286 (TELCYTA) vs. Gefitinib in Locally Advanced or Metastatic Non-Small Cell Lung Cancer conducted at New York Oncology Hematology, P.C. in NY; Queens Medical Associates in NY; New York Oncology Hematology, P.C. in NY; Business Park Drive in NY; Montefiore Medical Center in NYC; The Jack D. Weiler Hospital of the Albert Einstein College of Medicine in NYC; Albert Einstein Cancer Center at the Montefiore Medical Park in NYC; Alice Hyde Medical Center in NY; Myrna Sanchez, MD in NY; North Shore Hematology Oncology Associates, P.C. in NJ; Cooper Cancer Institute in NJ; Central Jersey Oncology Center in Massachusetts; University Hospital in NJ; Department of Hematology/Oncology in Massachusetts; Saint Vincent Hospital/Worcester Medical Center-Paul Seed in Massachusetts; Fallon Clinic Pharmacy-Linda Tolf, R.Ph. in Massachusetts; Northwestern Connecticut

Oncology/Hematology in Connecticut; Charlotte Hungerford Hospital in Connecticut; Northwestern Connecticut Oncology/Hematology in Connecticut; Sharon Hospital in Connecticut; Northwestern Connecticut Oncology/Hematology in Connecticut; New Milford Hospital in Connecticut; Medical Oncology & Hematology, P.C. in Connecticut; Medical Oncology & Hematology, P.C. in Connecticut; Medical Oncology & Hematology, P.C. in Connecticut; Medical Oncology & Hematology, P.C. in Connecticut; and Medical Oncology & Hematology, P.C. in Connecticut.

- TLK286 (TELCYTA) in Combination with Carboplatin (Paraplatin) Versus Doxil in Platinum Refractory or Resistant Ovarian Cancer conducted at Gynecologic Oncology & Minimal Invasive Surgery in NY; The Mary Imogene Bassett Hospital in NY; The Union State Bank Cancer Center in NY; Hematology-Oncology Associates of Rockland in NY; Long Island Jewish Medical Center in NY; North Shore University Hospital in NY; Schwartz Gynecologic Oncology in NY; Jersey Shore University Medical Center in NJ; Jsumc Ob/Gyn in NJ; The Cancer Institute of New Jersey in NJ; Robert Wood Johnson University Hospital in NJ; JFK Medical Center in NJ; A. Richard Miskoff, DO, PA in NJ; Massachusetts General Hospital in Massachusetts; Dana Farber/Partners Cancer Care, Inc. in Massachusetts; Beth Israel Deaconess Medical Center in Massachusetts; Boston Medical Center in Massachusetts; Boston Medial Center – Center for Cancer and Blood Disorders in Massachusetts; Caritas St. Elizabeth's Medical Center in Massachusetts; Perceptive Informatics, Inc. in Massachusetts; University of Connecticut Health Center/John Dempsey Hospital in Connecticut.

- Phase 3 Randomized Study of TELCYTA®+Liposomal Doxorubicin vs. Liposomal Doxorubicin in Platinum Refractory or Resistance Ovarian Cancer conducted at Schwartz Gynecologic Oncology in NY; The Mary Imogene Bassett Hospital in NY; Long Island Jewish Medical Center in NY; North Shore University Hospital in NY; and Monter Cancer Center, Lake Success in NY.

(c)    The investment banking and post-offering market-making activities conducted in connection with two Telik stock offerings during the Relevant Period took place in or were orchestrated from this District.

(d)    Dewey Ballantine LLP, located in New York City, served as counsel to the underwriters in connection with both Relevant Period stock offerings.

(e)    The prospectus issued in connection with the 2003 Offering stated the indentures and notes registered pursuant to that prospectus were to be governed by and construed in accordance with the laws of the State of New York and that the Depository Trust Company,

NYC, known as DTC, would be the depositary for all securities issued in book-entry from in the offering.

## PARTIES

18.     Plaintiff Erste-Sparinvest is a large institutional investor headquartered in Vienna, Austria.  Plaintiff holds shares in Telik and has continuously held shares of the Company throughout times relevant to the Action.  Pursuant to the authority of Erste-Sparinvest's Managing Director Dr. Franz Gschiegl and legal counsel Mag. Winfried Buchbauer, Erste-Sparinvest brings this action.  Dr. Franz Gschiegl and Mag. Winfried Buchbauer reside in Austria.

19.     Nominal defendant Telik is a Delaware corporation with its principal place of business in California.  Telik is a citizen of both states.  The Company's common stocks trades on the National Association of Securities Dealers Automated Quotations system ("NASDAQ") under the ticker symbol TELK.

20.     Defendant Michael M. Wick ("Wick") throughout the Relevant Period has been Chief Executive Officer ("CEO"), President of the Company, and Chairman of its Board. Because of Wick's leadership roles at Telik, he steered the Company's business and was responsible for the filing of Telik's financial results and press releases.   He was also responsible for the content and timing of all of the Company's public statements addressed in this complaint.  By virtue of his position, Wick was also privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects.  Wick was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public

investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects. Defendant Wick is a citizen of California.

21. Defendant Cynthia M. Butitta ("Butitta") throughout the Relevant Period has been Chief Operating Officer and Chief Financial Officer of the Company as well as a member of its Board. By virtue of her position, Butitta was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects. Butitta was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects. Defendant Butitta is a citizen of California.

22. Defendant Marc L. Steuer ("Steuer") since 2005 has been Senior Vice President, Business Development of the Company as well as a member of its Board. By virtue of his position, Steuer was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects. Steuer was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects. Defendant Steuer is a citizen of California.

23. Defendant Edward W. Cantrall ("Cantrall") throughout the Relevant Period has been a member of the Company's Board of Directors. By virtue of his position, Cantrall was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects. Cantrall was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products,

specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects. Defendant Cantrall is a citizen of Connecticut.

24.     Defendant Robert W. Frick ("Frick") throughout the Relevant Period has been a member of the Company's Board of Directors. By virtue of his position, Frick was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects. Frick was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects. Defendant Frick is a citizen of California.

25.     Defendant Steven R. Goldring ("Goldring") throughout the Relevant Period has been a member of the Company's Board of Directors. By virtue of his position, Goldring was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects. Goldring was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects. Defendant Goldring is a citizen of Massachusetts.

26.     Defendant Mary Ann Gray ("Gray") throughout the Relevant Period has been a member of the Company's Board of Directors. By virtue of her position, Gray was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects. Gray was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically

TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects. Defendant Gray is a citizen of New York.

27.     Defendant Richard B. Newman ("Newman") throughout the Relevant Period has been a member of the Company's Board of Directors.  By virtue of his position, Newman was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects.  Newman was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects.  Defendant Newman is a citizen of Massachusetts.

28.     Defendant Stefan Ryser ("Ryser") throughout the Relevant Period has been a member of the Company's Board of Directors.   By virtue of his position, Ryser was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects.  Ryser was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects.  Defendant Ryser is a citizen of New Jersey.

29.     Defendant Reinaldo F. Gomez ("Gomez") from 2003-2005 was Senior Vice Present, Product Development, and a member of the Company's Board of Directors.  By virtue of his position, Gomez was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects.  Gomez was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead

made factually inaccurate comments about the Company's and TELCYTA's prospects. Defendant Gomez is a citizen of California.

30.    Defendant Brown throughout the relevant period has been a Senior Vice President and the Chief Medical Officer of the Company.  By virtue of her position, Brown was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects.  Brown was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects.  Defendant Brown is a citizen of California.

31.    Defendant Herwig von Morze ("von Morze") throughout the Relevant Period has been a member of the Company's Board of Directors.   By virtue of his position, von Morze was privy to confidential information about the Company's business, finances, products, and markets as well as its present and future business prospects.  Von Morze was fully aware that Telik failed to disclose crucial, relevant and damaging information about the Company's products, specifically TELCYTA, to public investors and that Telik instead made factually inaccurate comments about the Company's and TELCYTA's prospects.  Defendant von Morze is a citizen of California.

32.    The individuals named as defendants in paragraphs 20-31 above are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with Telik, possessed the power and authority to control the contents of Telik's quarterly reports, press releases and presentations to the market, including but not limited to securities analysts, money and portfolio managers and institutional investors.  Each Individual Defendant was provided with copies of Telik's reports and press releases alleged herein to be misleading

before or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with Telik and access to material non-public information available to them but not to the public, each of these Individual Defendants was aware that the adverse facts specified herein about TELCYTA had not been disclosed to and were being concealed from the investing public and the FDA and that the positive representations that were being made were then materially false and misleading.

33.     As officers and controlling persons of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's present business and future prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

34.     Telik and the Individual Defendants are collectively referred to herein as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By virtue of their positions as directors and/or officers of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligation of loyalty. They were required and are required to exercise their utmost ability to control and to manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants

were and are required also to act in furtherance of the best interests of the Company and its

shareholders so as to benefit all shareholders equally and not in furtherance of their personal

interest or benefit. Each director and officer of the Company owes to the Company and its

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company and in the use and preservation of its property and assets, and the

highest obligations of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of the Company, were able to and did, directly and/or indirectly,

exercise control over the wrongful acts complained of herein.

37.     To discharge their duties, the Individual Defendants were required to exercise

reasonable and prudent supervision over the management, policies, practices, and controls of

the Company. By virtue of such duties, the Individual Defendants were required to, among

other things:

- exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

- when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

38.     Because of the Individual Defendants' positions with the Company, they had

access to the adverse undisclosed information about its business, operations, products –

specifically, TELCYTA – operational trends, financial statements, markets and present and

future business prospects via access to internal corporate documents (including the Company's

operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

39.    Each of the above defendant officers of Telik by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.

## SUBSTANTIVE ALLEGATIONS

40.    During the Relevant Period, Telik promoted itself to investors as the creator and manufacturer of the highly promising cancer drug candidate TELCYTA. At the same time, Defendants knew that the Company:  (i) made false and misleading statements about TELCYTA while failing to disclose adverse facts known to defendants about TELCYTA; including that patients using TELCYTA during clinical trials were dying several months sooner those not using patients not using TELCYTA; (ii) failed to disclose that the TELCYTA clinical trials, under the watch of the Company's Chief Medical Officer Gail L. Brown, M.D. – the wife of CEO Michael Wick – were not being conducted pursuant to FDA clinical trial standards, thereby generating data useless to the FDA; (iii) deceived the investing public regarding TELCYTA's FDA approval prospects; and (iv) artificially inflated the price of Telik common stock.

41.    The Relevant Period begins on March 27, 2003, when the Company announced that it had launched a controlled Phase 3 clinical trial of TELCYTA in ovarian cancer patients.

The release touted TELCYTA's prior performance in the Phase 2 clinical trial and other

purported benefits, stating, in relevant part, as follows:

> Telik, Inc. announced the initiation of a randomized, controlled Phase 3
> registration trial of TLK286 administered as a single agent in ovarian cancer
> patients whose disease has progressed following platinum-based chemotherapy
> and one second-line treatment.
>
> The multinational trial, designated the ASSIST-1 (Assessment of Survival In
> Solid Tumors-1) trial, is expected to enroll approximately 440 women. Patients
> will be randomized to a TLK286 treatment group, or to a control group receiving
> either Doxil® or Hycamtin®, drugs that are commonly used in the third-line
> ovarian cancer setting. The study is designed to evaluate whether TLK286
> treatment reduces the risk of death, leading to an increase in survival, as
> compared to the control group treatments.
>
> Results from a Phase 2 single agent study of TLK286 in ovarian cancer were
> presented at the American Society of Clinical Oncology meeting in May 2002 and
> at the EORTC/NCI/AACR meeting in November 2002. In this trial, objective
> tumor responses were observed and median patient survival was estimated at 17
> months by Kaplan-Meier analysis.
>
> "Ovarian cancer has the highest mortality rate of all gynecologic malignancies.
> There is an urgent need for new treatment alternatives since approximately 75%
> of new cases of ovarian cancer are diagnosed at an advanced stage," said Gail L.
> Brown, M.D., senior vice president and chief medical officer. ***"The objective
> responses and survival benefit observed with TLK286 in our Phase 2 ovarian
> cancer trial, the clinical activity reported in other cancers, including non-small
> cell lung, breast and colorectal, as well as the tolerability profile seen in more
> than 350 patients, provide a strong foundation for this Phase 3 trial."***
>
> About Ovarian Cancer and TLK286
>
> Approximately 25,400 new cases of ovarian cancer will be diagnosed in 2003,
> according to the American Cancer Society. Ovarian cancer is the sixth most
> common cause of cancer-related deaths in the U.S.
>
> ***TLK286 is a small molecule prodrug which is activated by GST P1-1, an
> enzyme present in higher levels in many human cancers than in normal tissues.
> Upon activation, TLK286 initiates an intracellular process known as apoptosis,
> or programmed cell death.*** Telik has retained worldwide commercialization
> rights to TLK286.

42.    The statements in the Company's March 27, 2003 release and other statements by the Company caused Wachovia Securities to issue a research report entitled "Telik Initiates Pivotal Study of TLK286 in Ovarian Cancer" on March 27, 2003, proclaiming great expectations for commercialization of TELCYTA as follows:

> **Expectations for Commercialization**
>
> In addition to the Phase III ovarian cancer trial, we expect Telik to initiate a Phase III trial of TLK 286 in second-line, non-small cell lung (NSCLC) cancer patients in late H2 2003. Based on the timing of these trials, *we estimate that TLK286 could start contributing to revenue in 2006. We estimate that nearly 9,000 patients could receive the drug in 2006, and nearly 19,000 patients could receive it in 2007. Using an estimated price of approximately $11,000 for a course of therapy, we estimate TLK286 sales at $98 million in 2006 and $204.4 million in 2007.* This price is consistent with current pricing on standard-of-care chemotherapy. *Market penetration is estimated at 4.8% for refractory ovarian cancer patients in 2006, and 7.5% in 2007. Market penetration is estimated at 1.5% for refractory NSCLC patients in 2006 and 2.8% in 2007.*

43.    On April 9, 2003, the Company issued a release entitled "Telik Announces New Preclinical Data on TLK286 that Supports Unique Mechanism of Activation, and Activity in Combinations with Standard Cancer Drugs." That release stated, in relevant part, as follows:

> Telik, Inc. announced a series of preclinical studies of its TLK286 product candidate, currently in a Phase 3 registration trial for ovarian cancer, and in clinical trials in non-small cell lung, breast and colorectal cancer. The studies were published in the March 2003 Proceedings of the Annual Meeting of the American Association for Cancer Research.
>
> TLK286 is a prodrug which is administered in an inactive form. It is activated in cancer cells by GST P1-1, an enzyme present in higher levels in important cancers including ovarian, lung, breast, colorectal, pancreas and lymphoma, than in normal tissue. *In previous studies, Telik scientists have reported that TLK286 induces cancer cell death via the stress response signaling pathway.* New preclinical data published on TLK286 include:
>
> - **TLK286-induced activation of the stress response apoptotic signaling pathway: confirmation of novel antitumor mechanism of action (Abstract # 2643).** TLK286 toxicity to cancer cells increases in a time- and dose-dependent manner after it is cleaved by GST P1-1. Using an analog of TLK286 that could